Gerald **BAGWELL, individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**FLORIDA BROADBAND, LLC, a Florida Limited Liability Company, and Dean C. Lovett, individually, Defendants.**

No. 04–60655–CIV.

United States District Court,
S.D. Florida,
Ft. Lauderdale Division.

July 22, 2005.

Christine Hanley, Sally Still, Christine D. Hanley & Associates, P.A., West Palm Beach, FL, for Defendants.

### *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

GRAHAM, District Judge.

This case involves the interpretation of a provision of the Fair Labor Standards Act ("the FLSA"), 29 U.S.C. § 201 *et seq.,* as applied to Plaintiff Gerald Bagwell Plaintiff was employed by Defendants Florida Broadband, LLC ("Florida Broadband") and its Chief Executive Officer, Dean Lovett ("Lovett"), as a Network Operation Engineer.

The FLSA establishes the minimum labor standards to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). "In other words, the statute was designed to 'aid the unprotected, unorganized, and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage'" *Hogan v. Allstate Ins. Co.*, 361 F.3d 621, 625 (11th Cir.2004) (quoting *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 n. 18, 65 S.Ct. 895, 89 L.Ed. 1296 (1945)). One of the standards established by the FLSA is to pay employees "engaged in commerce or in the production of commerce" overtime when an employee works more than forty hours in a week. 29 U.S.C. § 207(a)(1). However, an exemption from the overtime pay requirement exists for employees in a "bona fide executive, administrative, or professional capacity," as defined by the regulations of the Secretary of Labor.

Defendants contend that Plaintiff was an administrative or computer professional employee, exempt from the FLSA. Defendants also argue that Plaintiff is combination exempt, as defined under 29 C.F.R. § 541.600.

The Court held a trial over a seven (7) day period without a jury in this case. For the reasons set forth below, the Court determines that Plaintiff is exempt from the FLSA overtime provisions.

## I. Findings of Fact

### A. Defendants Florida Broadband and Dean Lovett

Defendants Florida Broadband and Lovett are employers within the meaning of the FLSA. Florida Broadband was engaged in the business of selling and providing high band width Internet service in Dade County and Broward County, Florida. Florida Broadband was an enterprise engaged in commerce or in the production of goods for commerce.

Florida Broadband was a start-up company. The organizational structure at Florida Broadband was flexible and evolving. When Lovett entered Florida Broadband in April, 2002, there were approximately fifteen (15) employees. Lovett was the President and CEO of Florida Broadband. Lovett set all policies including normal working hours, pay, and the manner in which employees interacted with customers. Underneath Lovett were two directors: George Morton ("Morton"), Director of Engineering, and Tony Anderson ("Anderson"), Director of Operations. Morton and Anderson owned equity in Florida Broadband.

The engineering realm of Florida Broadband was comprised of Plaintiff, Morton, and various field technicians. The field technicians worked on installation in the field.

Florida Broadband never had written or formal overtime policies. Nor did it keep records of the hours that Plaintiff worked.

### B. Plaintiff Gerald Bagwell

In April, 2003, Plaintiff was hired by Defendants as a part-time hourly independent contractor. On May 8, 2003, Plaintiff was hired by Defendants as a full-time Network Operation Engineer. On April 15, 2004, Defendants terminated Plaintiff's employment.

Plaintiff's job involved comprehending and understanding abstract ideas. Working as a Network Operation Engineer required an understanding of network characteristics and the standards that are used in that network. The job also required knowledge of routing and switching.

In 2001, prior to commencing work for Florida Broadband, Plaintiff graduated

from Florida International University with a Bachelor's Degree in Business and a specialty in Management Information Systems. Plaintiff had also received an Associate's Degree in Computer Engineering from Broward Community College. In addition, from 2000 until 2003, Plaintiff worked as an Adjunct Instructor at Broward Community College. Specifically, Plaintiff was the lead instructor for the Cisco Networking Academy Program. Part of that course work involved network routing and switching. The courses Plaintiff taught counted toward a degree program at Broward Community College.

Plaintiff possesses various computer and network related certifications. He has a certification associated with networking that helps him diagnose problems within the Windows operating system. He was a Novell associate. He earned certification in Ortronics System Infrastructure and 3–M Fiberoptics. He earned another certification in C–Core and Fiberoptics. Plaintiff also has a certificate in Superior Modular Products which deals with infrastructure components. Plaintiff testified that his Ortronics System Infrastructure Certification and the Superior Modular Products Certification related to the work for Florida Broadband that was done in the field. He also testified that his Cisco CCNA Certificate related to his work at Florida Broadband.

### C. Plaintiff's Work As Network Operation Engineer

As a Network Operation Engineer, Plaintiff was engaged in commerce and the work he performed was directly essential to the business operations of Florida Broadband in interstate commerce. Plaintiff and Morton were responsible for the network functionality.

Plaintiff exercised discretion and independent judgment in the performance of his duties. As a Network Operation Engineer for Florida Broadband, Plaintiff performed the following work, among other things:

Wrote specifications for wireless network topology;

Wrote specifications for routers and switches used in network;

Specified protocols used in network;

Designed and assured proper installation of all cabling infrastructure including fiber optic;

Maintained network availability and security;

Interacted with clients for level 3 support;

Consulted with clients for LAN design and technical specifications;

Interacted with vendors for pricing and availability of materials;

Scheduled technical field staff for surveys and installations;

Scheduled maintenance of network;

Maintained detailed network documentation;

Approved site installations of infrastructure and equipment;

Designed and implemented LAN infrastructure;

Recommended purchases of network equipment; and

Evaluated emerging technologies.[1]

---

1. This job description is the same as that which Plaintiff listed on his resume when applying for employment with Florida Career College in June, 2004. [Def. Exh. 4–S]. The Court notes that Defendant produced a different version of his resume to Defendants during discovery in this case. The revised resume produced to Defendants reads that Plaintiff "assist[ed]" with many of the tasks listed above and on Defendant's resume submitted to Florida Career College. Plaintiff testified that the resumes are truthful and detail work that he engaged in while at Florida Broadband.

In addition, Plaintiff recommended employees for a pay raise based on their job performance. Plaintiff also made recommendations about whether individuals should be hired by Florida Broadband. Plaintiff approved Expense Reports. [Def. Exh. D, H, BB, & DD]. On various Expense Statements, Plaintiff is listed as the "Manager" of the following individuals at Florida Broadband: (1) field technician Jeff Schechtman ("Schechtman") [Def. Exh. D & DD]; and (2) field technicians Mark Anthony Minott ("Minott") [Def. Exh. H].

Additionally, Plaintiff approved vacations for field technicians and signed off on "Personal/Vacation Time Off Request Forms." For example, on the March 24, 2004, Time Off Request Form submitted by Florida Broadband field technicians Maurice Page, Plaintiff provided the "Management Signature." [Def. Exh. F]. Workers contacted Plaintiff about taking time off from work. For example, in an e-mail from Schechtman to Plaintiff, Schechtman writes: "If there is any problem with me taking these few days off please let me know as soon as possible because I will have to change my flight reservations." [Def. Exh. G].

In addition, time sheets were submitted to Plaintiff. [Def. Exh. X]. Plaintiff signed time sheets. [Def. Exh. X & Z]. On some time sheets, Plaintiff provided the "Sup. Signature," which the Court interprets as Supervisor, or Supervising, Signature.[2] [Def. Exh. Z] On other time sheets, Plaintiff provided the "Mgr Signature," which the Court interprets as Manager Signature. [Def. Exh. Z].

Further, individuals who wanted to be hired as part-time installers at Florida Broadband would contact Plaintiff. Plaintiff interviewed job applicants, including field technician Maurice Page ("Page"). The part-time installers were trained by field technicians. Plaintiff gave work assignments to the field technicians according to the directions of Lovett, the CEO of Florida Broadband, and Anderson, the Director of Marketing. Plaintiff and Morton, who was Director of Engineering and an equity holder, sometimes worked in the field. Plaintiff sometimes worked on installation matters in the field. Plaintiff also showed workers in the field how their work should be done. In addition, Plaintiff went into the field to ensure that work was accomplished correctly. The field technicians would go to Morton or Plaintiff when they encountered a problem.

In addition, Plaintiff also worked at problem solving, looking at the network to determine what the issues were. The amount of time Plaintiff spent problem solving varied each day. Sometimes, Plaintiff would spend all day solving network problems, and other days he would spend no time at all problem solving. When Plaintiff began working at Florida Broadband, he was asked to examine Florida Broadband's network infrastructure to determine whether it was of appropriate commercial quality and to identify better products. Plaintiff also evaluated the manner in which data was transmitted throughout the network. Plaintiff identified concerns with proprietary software and made recommendations to Lovett based thereon.

Plaintiff collaborated with Morton, who was the Director of Engineering, an Officer, and an equity holder of Florida Broad-

---

**2.** The bottom of the time sheets read as follows:

Contractor Signature ⸺⸺
TL Signature ⸺⸺
Sup Signature ⸺⸺

Plaintiff signed on the line for Sup Signature. When Plaintiff was asked what "Sup Signature" means on the time sheets, he answered, "I have no idea"

band. Plaintiff and Morton spoke on a daily basis. Plaintiff and Morton discussed network equipment, transmission media and format, the quality of certain equipment, and whether one type of equipment would be better for Florida Broadband than another. Plaintiff collaborated with Morton on network design. Plaintiff and Morton went to each other with network problems and worked with each other to try and fix those problems. Plaintiff and Morton worked together to come up with better network solutions on a regular basis.

### D. Plaintiff's Salary And Hours

Defendants paid Plaintiff on a salary basis. Plaintiff was paid at a rate of $50,000.00 annually. Plaintiff's salary did not rely on the number of hours worked. Plaintiff's salary was not subject to improper deductions. Plaintiff worked more than forty (40) hours during some weeks of his employment for Defendants. There are no time sheets or records maintained by Florida Broadband that reflect the hours Plaintiff worked. Plaintiff testified that, on average, he worked 50 or 60 hours per week. According to Plaintiff, he spent 15 to 25 hours per week in the field, 25 to 30 hours per week troubleshooting, and five to ten hours per week speaking with vendors.

Plaintiff was usually at the Florida Broadband office from 8:00 a.m. until 5:00 p.m. According to Page, Plaintiff arrived to work at 8:00 a.m., when Page arrived Page and Anderson testified that Plaintiff usually left the office at 5:00 p.m., before they left. Plaintiff claims that he worked additional hours outside of the Florida Broadband office and, specifically, from home.

The Court finds that there is no credible evidence of the specific number of hours Plaintiff worked. At trial, Plaintiff introduced a copy of records that Plaintiff claims are contemporaneous notes of his hours and work during his employment with Florida Broadband. [Pl. Exh. 2]. The Court requested the original notes. A comparison of the copy introduced by Plaintiff, to the original notes, marked as Court Exhibits 1 through 4, indicates that the original and the copy are dissimilar. The original notes were redacted in places. Indeed, blank paper still covers certain language on the original notes that does not appear in the copy. Also, on the original, the color of the ink varies on different parts of the page and the writing appears to be inconsistent.

In addition, in the notes, Plaintiff wrote the number of hours worked beyond 8:00 a.m. to 5:30 p.m. The first page of Plaintiff's notes are dated May 8, 2003, Plaintiff's first day of employment with Florida Broadband. Thus, since his first day of employment with Florida Broadband Plaintiff claims he maintained notes of how many hours he worked beyond 8:00 a.m. to 5:30 a.m. Plaintiff claims that he kept such notes even though he was aware that he was paid a set salary.[3] Plaintiff did not keep track of the time when he ate lunch or otherwise was not working.

### II. Conclusions of Law

■ The FLSA provides an exemption from the overtime pay provisions for "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). In interpreting this provision, the courts are guided by case law and by the Regulations

---

**3.** The Court asked Plaintiff why he kept notes of the hours he worked beyond 8:00 am to 5:30 p.m., when Plaintiff knew he was a salary employee. Plaintiff first responded that he recorded his hours when he was a truck driver and that the process of maintaining hours is engrained. After additional questioning by the Court, Plaintiff explained that he kept track of the hours as a check and balance tool.

and Interpretations promulgated by the Secretary of Labor (the "Secretary"). The employer carries the burden of proving the exemption, and the overtime provisions of the FLSA are narrowly construed against the employer. *Hogan v. Allstate Ins. Co.*, 361 F.3d 621, 625 (11th Cir.2004).

## A. Administrative Exemption

■ The FLSA does not apply with respect to any individual employed in a bona fide administrative capacity. 29 U.S.C. § 213(a)(1). In order for the administrative exemption to apply, Defendants must prove the following: (1) plaintiff was paid on a salary basis of at least $250 per week; (2) plaintiff's primary duty consisted of the performance of office work "directly related to management policies or general business operations of the employer or the employer's customers;" and (3) plaintiff's performance of such primary duty included "work requiring the exercise of discretion and independent judgment."[4] 29 C.F.R. § 541.2(e)(2).[5]

### 1. Salary

The first prong of the administrative exemption test is whether the employee was compensated at a salary of more than $250.00 per week. An employee is considered "paid on a salary basis" if he "regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the qual-

ity or quantity of the work performed." *See id.* (quoting 29 C.F.R. §§ 531.118; 541.212). Here, Plaintiff was paid a salary of $50,000.00 per year, which amount was not subject to reduction because of the quality or quantity of his work. Plaintiff was paid on a salary basis of more than $250.00 per week. Accordingly, the first prong of the administrative exemption test is met.

### 2. Whether Plaintiff's Primary Duty Consisted Of The Performance Of Office Work Directly Related To Management Policies Or General Business Operations Of The Employer Or The Employer's Customers

#### a. Primary Duty

The Court begins its analysis of this prong by determining what Plaintiff's primary duty was. The Secretary of Labor has issued an interpretation of "primary duty." That interpretation is as follows:

A determination of whether an employee has management as his primary duty must be based on all the facts in a particular case. The amount of time spent in the performance of the managerial duties is a useful guide in determining whether management is the primary duty of an employee. In the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent, of the employee's time. Thus, an employee who

---

4. The FLSA's implementing Regulations provide employers with two tests by which to prove that employees fall under the administrative exemption: (1) the "long test," which applies to employees paid on a salary or fee basis at a rate of not less than $155 per week; and (2) the "short test," which applies to employees paid at a rate of not less than $250 per week 29 C.F.R. § 541.2(e)(1)-(2). Here, it is undisputed that Plaintiff earned in excess of $250 per week. Accordingly, the Court will

examine Defendants' argument under the short test.

5. The Department of Labor revised the FLSA's implementing regulations governing certain exemptions, effective August 23, 2004. 29 C.F.R. § 541. Plaintiff's employment ended on April 15, 2004, and the Complaint was filed on May 17, 2004 Therefore, the Court applies the prior regulations and interpretations.

spends over 50 percent of his time in management would have management as his primary duty. *Time alone, however, is not the sole test,* and in situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the *other pertinent factors* support such a conclusion.

*29 C.F.R. § 541.103* (emphasis added).

The "other pertinent factors" cited in the interpretation is as follows:

[T]he relative importance of the managerial duties as compared with other types of duties, the frequency with which the employee exercises discretionary powers, his relative freedom from supervision, and the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor.

*Id.*

The interpretation also provides examples of situations where other pertinent factors weigh in favor of finding an employee's primary duty administrative in nature:

For example, in some departments, or subdivisions of an establishment, an employee has broad responsibilities similar to those of the owner or manager of the establishment, but generally spends more than 50 percent of his time in production or sales work. While engaged in such work he supervises other employees, directs the work of warehouse and delivery men, approves advertising, orders merchandise, handles customer complaints, authorizes payment of bills, or performs other management duties as the day-to-day operations require. He will be considered to have management as his primary duty. In the data processing field an employee who directs the day-to-day activities of a single group of programmers and who

performs the more complex or responsible jobs in programming will be considered to have management as his primary duty.

*Id.*

The Court now turns to the instant case. There was no typical day at work for Plaintiff. As discussed previously, Plaintiff developed and improved Florida Broadband's network system in an effort to make it function reliably. Plaintiff was not a production employee. Plaintiff wrote specifications for wireless network topology, wrote specifications for routers and switches used in network, specified protocols used in the network, designed and assured proper installation of all cabling infrastructure including fiber optic, maintained network availability and security, interacted with clients for level 3 support, consulted with clients for LAN design and technical specifications, interacted with vendors for pricing and availability of materials, scheduled technical field staff for surveys and installations, scheduled maintenance of network, maintained detailed network documentation, approved site installations of infrastructure and equipment, designed and implemented LAN infrastructure, recommended purchases of network equipment, evaluated emerging technologies, handled customer problems and complaints, assigned work to field technicians, solved problems with the network, collaborated with the Director of Engineering, made hiring and pay raise recommendations, spent some time in the field, and checked the work of the field technicians. Plaintiff had broad responsibilities similar to those of the Director of Engineering.

Plaintiff's primary duty was not manual in nature. Some of Plaintiff's work may be considered manual in that he performed some physical actions, such as installations. However, those actions do not negate the

administrative exemption because of the prominence of Plaintiff's problem-solving, office, and administrative duties. *See Koppinger v. American Interiors, Inc.*, 295 F.Supp.2d 797, 802 (N.D.Ohio 2003).

The Court finds that Plaintiff's primary duty was developing, improving, and making Florida Broadband's network system function reliably. Plaintiff's primary duty was administrative, and not manual, in nature.

### b. Directly Related To Management Policies Or General Business Operations Of The Employer Or The Employer's Customers

The next inquiry is whether Plaintiff's primary duty was "directly related to management policies or general business operations of the employer." Section 541.205(a) of the Secretary's Interpretations explains the phrase "directly related to management policies or general business operations of his employer or his employer's customers":

> (a) The phrase "directly related to management policies or general business operations of his employer or his employer's customers" describes those types of *activities relating to the administrative operations of a business* as distinguished from "production" or, in a retail or service establishment, "sales" work. In addition to describing the types of activities, the phrase limits the exemption to persons who perform work of *substantial importance to the management* or operation of the business of his employer or his employer's customers.

29 C.F.R. § 541.201(a).

Thus, in order for the exemption to apply, Plaintiff's work must relate to the administrative operations of Florida Broadband and must be of substantial importance to the management or operation of Florida Broadband's business.

The Court turns first to assessing whether Plaintiff's work as a Network Operation Engineer related to the administrative operations of Florida Broadband. 29 C.F.R. § 541.201(b) identifies the administrative operations of a business:

> (b) The administrative operations of the business include the work performed by so-called white-collar employees engaged in "servicing" a business as, for, example, *advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control.* An employee performing such work is engaged in activities relating to the administrative operations of the business notwithstanding that he is employed as an administrative assistant to an executive in the production department of the business.

29 C.F.R. § 541.201(b).

In the instant case, Plaintiff engaged in advising management, planning, negotiating, promoting sales, and business research Plaintiff's job involved finding network solutions to complex problems of Florida Broadband and its customers. The Court finds that Plaintiff was engaged in activities relating to the administrative operations of the business.

The Court now turns to whether Plaintiff's work was of "substantial importance" to Florida Broadband. "It is not possible to lay down specific rules that will indicate the precise point at which work becomes of substantial importance to the management or operation of a business." 29 C.F.R. § 541.201(c)(1). The Court turns for guidance to Interpretation 29 C.F.R. § 541.201(c), which describes work of "substantial importance":

> (c) As used to describe work of substantial importance to the management or operation of the business, the phrase "directly related to management policies

or general business operations" is *not limited to persons who participate in the formulation of management policies or in the operation of the business as a whole.* Employees whose work is "directly related" to management policies or to general business operations include those work affects policy or whose responsibility it is to execute or carry it out. The phrase also includes a wide variety of persons who either carry out major assignments in conducting the operations of the business, or whose work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business.

Here, Florida Broadband sold internet access and its success was dependent upon whether it could provide the internet service. Plaintiff worked to ensure that Florida Broadband could provide that service Plaintiff's primary duty as a Network Operation Engineer was developing, improving, and making Florida Broadband's network system function reliably. Plaintiff worked at a responsible level and performed work directly related to management policies or the operation of Florida Broadband. The Court concludes that the nature of Plaintiff's work as a Network Operation Engineer was of "substantial importance" to Florida Broadband.

Having found (1) that Plaintiff's primary duty was developing, improving, and making Florida Broadband's network system function reliably, and (2) that this activity was directly related to the management policies or general business operations of Florida Broadband and of substantial importance to Florida Broadband, the Court concludes that the Network Operation Engineer position satisfies the second prong of the short test.

### 3. Whether Plaintiff's Performance Of Such Primary Duty Included Work Requiring The Exercise Of Discretion And Independent Judgment

The third prong of the short test requires an analysis of whether the Plaintiff used "discretion and independent judgment" in carrying out his duties. The Secretary's interpretation defines "the exercise of discretion and independent judgment" as "the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.207(a). The discretion that is contemplated by this part of the test is discretion that is "real and substantial, that is, ... exercised with respect to matters of consequence." 29 C.F.R. § 541.207(d)(1).

In distinguishing precisely what sort of "discretion and independent judgment" is "real and substantial," the interpretations distinguish between "the kinds of decisions normally made by clerical and similar types of employees" and "the kinds of decisions normally made by persons who formulate or participate in the formulation of policy within their spheres of responsibility or who exercise authority within a wide range to commit their employer in substantial respects financially or otherwise." 29 C.F.R. § 541.207(d)(2). The interpretations caution that a "frequent cause of misapplication of the term 'discretion and independent judgment' is the failure to distinguish it from the use of skill in various respects." 29 C.F.R. § 541.207(c)(1). Purely mechanical or routine work is not professional work. 29 C.F.R. § 541.305(b).

As detailed above, Plaintiff recommended decisions that directly affected Florida Broadband's operations and financial future. Although Plaintiff did not

have the ultimate authority to make these decisions, that does not defeat a finding that he exercised independent judgment and discretion. *Dymond v. United States Postal Serv.*, 670 F.2d 93 (8th Cir.1982). Although Plaintiff was guided by the CEO and Director of Engineering, Plaintiff had the discretion to suggest hiring, pay rises, equipment purchases, and ways for improving and correcting the network In addition, Plaintiff sometimes spent most of his day problem solving and thinking about ways to improve the network. Further, Plaintiff's duties of writing specifications for wireless network topology and for routers and switches, designing and assuring proper installation of all cabling infrastructure, consulting with clients for LAN design and technical specifications, and approving installations indicate the exercise of discretion and independent judgment. Plaintiff's work was not routine, but varied dramatically from day to day.

In addition, in making the determination that Plaintiff exercised "discretion and independent judgment," the Court is guided by the Secretary's interpretations concerning the meaning of "discretion and independent judgment." In the discussion of the difference between "skill" and "discretion and independent judgment," the interpretations set forth various examples of jobs in which skill might be mistaken for discretion. 29 C.F.R. § 541.207(c)(2). The examples of the application of skills and procedures include "ordinary inspection work of various kinds" and "examiners or graders," who exercise skill within established standards, rather than discretion and independent judgment

By contrast, the interpretation states that in the data processing field, a systems analyst is exercising discretion and independent judgment when he develops methods to process, for example, accounting, inventory, sales, and other business information by using electronic computers. The interpretation also provides that

> [a systems analyst] also exercises discretion and independent judgment when he determines the exact nature of the data processing problem, and structures the problem in a logical manner so that a system to solve the problem and obtain the desired results can be developed. Whether a computer programmer is exercising discretion and independent judgment depends on the facts in each particular case. Every problem processed in a computer first must be carefully analyzed so that exact and logical steps for its solution can be worked out. When this preliminary work is done by a computer programmer he is exercising discretion and independent judgment. None of these positions resemble the job done by Plaintiff as a Network Operation Engineer.

Like the systems analyst in the Secretary's interpretation, Plaintiff determined the exact nature of various network problems and, alone or in collaboration with Morton, structured various problems in a logical manner so that a system to solve the problems and obtain the desired results could be developed. The Court has analyzed Plaintiff's job duties and responsibilities in this case and finds that Plaintiff exercised independent judgment.

Based upon the foregoing, the Court concludes that Plaintiff exercised discretion and independent judgment, and so meets the third prong of the short test. Having found that the requirements of the administrative exemption are met, the Court finds that Plaintiff is exempt from the overtime provisions of the FLSA.

**B. Computer Professional Exemption**

■ 29 C.F.R. § 541.3 sets forth the requirements for the minimum wage,

overtime, and record keeping exemption for "professional" employees. Under the short test set forth in Section 541.3, a computer professional employee is exempt if: (1) he is paid at least $250.00 per week on a salary basis; (2) his primary duty consists of the performance of "work that requires theoretical and practical application of highly-specialized knowledge in computer systems analysis, programming, and software engineering, and who is employed and engaged in these activities as a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker in the computer software field; and (3) the primary duty involves the consistent exercise of discretion and judgment."

Thus, two of the three requirements of the computer professional exemption are identical to the requirements of the administrative exemption. Specifically, both exemptions require that Plaintiff be paid at least $250.00 per week on a salary basis and that Plaintiff's primary duty involve the consistent exercise of discretion and judgment. As discussed previously, both of these requirements are met in the present case. Accordingly, the Court need only address whether Plaintiff's primary duty consists of the performance of "work that requires theoretical and practical application of highly-specialized knowledge in computer systems analysis, programming, and software engineering."

To be considered for the computer professional exemption under 29 C.F.R. § 541.3(a)(4), an employee's primary duty must consist of one or more of the following:

(1) The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications;

(2) The design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;

(3) The design, documentation, testing, creation or modification of computer programs related to machine operating systems; or

(4) a combination of the aforementioned duties, the performance of which requires the same level of skills.

29 C.F.R. § 541.303(b)(1)-(4).

As discussed previously, Plaintiff's primary duty was developing, improving, and making Florida Broadband's network system function reliably. In carrying out this duty, Plaintiff wrote specifications for wireless network topology, wrote specifications for routers and switches used in network, specified protocols used in the network, designed and assured proper installation of all cabling infrastructure including fiber optic, maintained network availability and security, interacted with clients for level 3 support, consulted with clients for LAN design and technical specifications, interacted with vendors for pricing and availability of materials, scheduled technical field staff for surveys and installations, scheduled maintenance of network, maintained detailed network documentation, approved site installations of infrastructure and equipment, designed and implemented LAN infrastructure, recommended purchases of network equipment, and evaluated emerging technologies.

Several of the above-listed duties indicate that Plaintiff was involved in the design, development, and analysis of the computer system or program based on and related to user or system design specifications. Plaintiff was also applying systems analysis techniques and procedures, including consulting with users, "to determine hardware, software, or system functional specifications."

Employees who qualify for the computer professional exemption are highly-skilled in computer systems analysis, programming, or related work in software functions. 29 C.F.R. § 541.303(c). The Eleventh Circuit has held that "before a particular position can qualify as one which climbs to the level of the professional exemption of section 213(a)(1), the duties of that position must call for a person who is in a learned profession with at least a college degree in a specialized type of learning. . . ." *Dybach v. State of Fla. Dept. Of Corrections*, 942 F.2d 1562, 1565 (11th Cir.1991). Based on Plaintiff's background, education, certifications, teaching experience, and testimony, the Court finds that Plaintiff had expertise and skills in the areas pertaining to carrying out the above-listed duties. Plaintiff applied his highly specialized knowledge to his network engineering position with Florida Broadband on a regular basis. The Court finds that Plaintiff is a "skilled worker" as defined in 29 U.S.C. § 213(a).

Accordingly, the Court finds that the computer professional exemption applies in this case.

### C. Combination Exemption

■ Finally, the Court turns to Defendants' claim that Plaintiff is combination exempt. 29 C.F.R. § 541.600 sets out the requirements of the combination exemption. Specifically, this section reads as follows:

(a) The divisions' position under the regulations in Subpart A of this part permits the "tacking" of exempt work under one section of the regulations in Subpart A to exempt work under another section of those regulations, so that a person who, for example, performs a combination of executive and professional work may qualify for exemption. In combination exemptions, however, the employee must meet the stricter of the requirements on salary and nonexempt

work. For instance, if the employee performs a combination of an executive's and an outside salesman's function (regardless of which occupies most of his time) he must meet the salary requirement for executives. Also, the total hours of nonexempt work under the definition of "executive" together with the hours of work which would not be exempt if he were clearly an outside salesman, must not exceed either 20 percent of his own time or 20 percent of the hours worked in the workweek by the nonexempt employees of the employer, whichever is the smaller amount.

(b) Under the principles in paragraph (a) of this section combinations of exemptions under the other sections of the regulations in Subpart A of this part are also permissible. In short, under the regulations in Subpart A, work which is "exempt" under one section of the regulations in Subpart A will not defeat the exemption under any other section.

Defendants claim that Plaintiff is combination exempt under a combination of the administrative, computer professional, and executive exemptions. Having addressed the applicability of the administrative and computer professional exemptions, the Court now turns to examine the applicability of the executive exemption to this case.

As with the administrative and computer professional exemptions, there is a short test under the executive exemption. The executive exemption test is as follows: (1) Plaintiff is paid at least $250.00 per week on a salary basis; (2) Plaintiff's primary duty is management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof; and (3) Plaintiff's primary duty includes the customary and regular direction of the work of two or more other employees therein. 29 C.F.R. § 541.1.

As discussed previously, prong one of this test has been met. As to prong two, the Court previously determined that Plaintiff's primary duty is developing, improving, and making Florida Broadband's network system function reliably. Accordingly, Plaintiff's primary duty is not management. However, Plaintiff performed many management duties.

29 C.F.R. § 541.102 explains the term "management" and provides examples of management duties:

(a) In the usual situation the determination of whether a particular kind of work is exempt or nonexempt in nature is not difficult. In the vast majority of cases the bona fide executive employee performs managerial and supervisory functions which are easily recognized as within the scope of the exemption.

(b) For example, it is generally clear that work such as the following is exempt work when it is performed by an employee in the management of his department or the supervision of the employees under him: Interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the men and the property.

Here, Plaintiff interviewed workers and trained field technicians. Plaintiff gave field technicians work assignments. Plaintiff approved vacation time and signed time sheets. Plaintiff also made recommendations concerning the type of equipment Florida Broadband should purchase.

The Court now turns to the third prong of the executive exemption test, which requires that Plaintiff supervised at least two employees. Here, there is evidence that Plaintiff supervised contractors.

Based upon the foregoing, the Court finds that the requirements of the executive exemption test are not met. The Court finds, however, that, in consideration of Plaintiff meeting the requirements of the administrative exemption and the computer professional exemption, the combination exemption *may* apply. However, it is not necessary to resolve this issue in view of the Court's aforementioned ruling.

## III. CONCLUSION

In light of the foregoing findings of fact and conclusions of law, in which the Court determined that the administrative exemption and *computer professional exemption* apply, it is

**ORDERED AND ADJUDGED** that Plaintiff is exempt from the overtime wage provisions of the Fair Labor Standards Act under 29 U.S.C. § 213(a)(1). The Court will enter a Final Judgment denying liability under the FLSA.